# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
### FT. LAUDERDALE DIVISION

| | | |
|---|---|---|
| Robert D. Dance, et al. Individually and on Behalf of All other Similarly Situated, | ) ) ) | **Case No. 08-60111 - CIV-GRAHAM/GOODMAN** |
| Plaintiff, | ) ) | |
| vs. | ) ) | |
| | ) | **CLASS ACTION** |
| LEVITT CORPORATION (*d/b/a* WOODBRIDGE HOLDING CORPORATION), and ALAN B. LEVAN, | ) ) ) | |
| Defendants. | ) ) ) | |
| _____ | ) | |

## LEAD PLAINTIFF'S MOTION FOR FINAL APPROVAL OF SETTLEMENT AND PLAN OF ALLOCATION AND INCORPORATED MEMORANDUM OF LAW

BERMAN DeVALERIO
Kyle G. DeValerio (FBN 0018565)
3507 Kyoto Gardens Drive, Suite 200
Palm Beach Gardens, FL  33410
Tel:    (561) 835-9400
Fax:    (561) 835-0322

*Liaison Counsel and Attorney for Lead Plaintiff and the Class*

KIRBY McINERNEY LLP
Daniel Hume
Ira M. Press
Mark A. Strauss
825 Third Avenue, 16th Floor
New York, NY  10022
Tel:    (212) 371-6600
Fax:    (212) 751-2540

*Lead Counsel and Attorney for Lead Plaintiff and the Class*

## <u>TABLE OF CONTENTS</u>

I.    INTRODUCTION ............................................................................................. 1

II.   SUMMARY OF ALLEGATIONS AND CLAIMS ............................................. 2

III.  PROCEDURAL HISTORY ............................................................................. 4

IV.   ARGUMENT .................................................................................................. 7

   A.   This Settlement Should Be Approved As It is Fair, Reasonable and Adequate Under The Eleventh Circuit's Standards ................................................................................. 7

     1.   The Settlement Is the Product of Arms'-Length Negotiations .................................... 8
     2.   The Complexity, Expense, and Duration of Litigation Renders This Settlement Fair, Reasonable And Adequate ............................................................................. 9
     3.   The Stage Of Proceedings At Which The Settlement Was Achieved ....................... 10
     4.   The Probability Of Lead Plaintiffs' Success On The Merits Renders This Settlement Fair, Reasonable and Adequate ..................................................................... 11
     5.   The Range Of Possible Recovery Renders This Settlement Fair, Reasonable and Adequate ............................................................................................... 12
     6.   The Opinions Of Counsel, Class Representatives, and the Substance Of Opposition To The Settlement Support This Settlement as Fair, Reasonable And Adequate ............... 14

   B.   The Plan Of Allocation Should Be Approved As It Is Fair, Reasonable, And Adequate  15

   C.   Notice To The Class Satisfies Due Process Requirements ............................................. 17

V.    CONCLUSION ............................................................................................. 18

## **TABLE OF AUTHORITIES**

Cases

*Ass'n. for Disabled Americans, Inc. v. Amoco Oil Co.*,
   211 F.R.D. 457 (S.D. Fla. 2002) ............................................................................ 15

*Austin v. Pa. Dept. of Corrections*,
   876 F. Supp. 1437 (E.D. Pa. 1995) ....................................................................... 15

*Behrens v. Wometco Enterprises, Inc*.,
   118 F.R.D. 534 (S.D. Fla. 1988), *aff'd*, 899 F.2d 21 (11th Cir. 1990)............................ 7, 8, 14

*Bennett v. Behring Corp.*,
   737 F.2d 982 (11th Cir. 1984) ........................................................................... 8, 9

*Cagan v. Anchor Sav. Bank FSB*,
   No. 88-cv-3024, 1990 WL 73423 (E.D.N.Y. May 22, 1990).......................................... 14

*Canupp v. Liberty Behavioral Health Corp*.,
   No. 09-cv-16334, 2011 WL 778208 (11th Cir. Mar. 7, 2011) .................................. 8

*Carpenters Health & Welfare Fund v. Coca-Cola Co.*, 5
   87 F. Supp. 2d 1266 (N.D. Ga. 2008) ................................................................ 16

*Chatelain v. Prudential-Bache Sec., Inc.*,
   805 F. Supp. 209 (S.D.N.Y. 1992)...................................................................... 11

*Class Plaintiffs v. City of Seattle*,
   955 F.2d 1268 (9th Cir. 1992) .......................................................................... 16

*Cotton v. Hinton*,
   559 F.2d 1326 (5th Cir. 1977) .................................................................... 10, 12

*Dikeman v. Progressive Exp. Ins. Co.*,
   312 F. App'x. 168 (11th Cir. 2008) ..................................................................... 7

*Eisen v. Carlisle & Jacquelin*,
   417 U.S. 156, 173 (1974) (emphasis omitted) ....................................................... 17

*Fresco v. Auto Data Direct, Inc*,
   No. 03 Civ. 61063, 2007 WL 2330895 (S.D. Fla. May 14, 2007) .......................... 14

*Holman v. Student Loan Xpress, Inc.*,
   No. 08-cv-305, 2009 WL 4015573 (M.D. Fla. Nov. 19, 2009)................................. 8

*Holmes v. Cont'l Can Co.*,
  706 F.2d 1144 (11th Cir. 1983) (citation omitted)............................................... 17

*In re Cendant Corp. Litig.*,
  264 F.3d 201 (3d Cir. 2001)............................................................................... 14

*In re Domestic Air Transp. Antitrust Litig.*,
  148 F.R.D. 297 (N.D. Ga. 1993).......................................................................... 14

*In re Global Crossing Sec. & ERISA Litig.*,
  225 F.R.D. 436 (S.D.N.Y. 2004) ......................................................................... 16

*In re Ikon Office Solutions, Inc., Sec. Litig.*,
  194 F.R.D. 166 (E.D. Pa. 2000)........................................................................... 16

*In re Merck & Co., Inc. Vytorin ERISA Litig.*,
  No. 08 Civ. 285, 2010 WL 547613, (D.N.J. Feb. 9, 2010)..................................... 15

*In re Oracle Sec. Litig.*,
  No. 90 Civ. 0931, 1994 WL 502054, (N.D. Cal. June 18, 1994) ............................ 16

*In re SmithKline Beckman Corp. Sec. Litig.*,
  751 F. Supp. 525 (E.D. Pa. 1990) ........................................................................ 12

*In re Sunbeam Sec. Litig.*,
  176 F. Supp. 2d 1323 (S.D. Fla. 2001) ....................................................... 7, 8, 9, 16

*In re U.S. Oil & Gas Litig.*,
  967 F.2d 489 (11th Cir. 1992 ................................................................................ 7

*Ingram v. The Coca-Cola Co.*,
  200 F.R.D. 685 (N.D. Ga. 2001)....................................................................... 9, 15

*Leverso v. SouthTrust Bank of AL., Nat. Assoc.*,
  18 F.3d 1527 (11th Cir. 1994) .............................................................................. 8

*Lipuma v. Am. Express*,
  406 F. Supp. 2d 1298 (S.D. Fla. 2005) ............................................................ 11, 12

*Mashburn v. Nat. HealthCare, Inc.*,
  684 F. Supp. 660 (M.D. Ala. 1988) ...................................................................... 14

*Mehling v. New York Life Ins. Co.*,
  248 F.R.D. 455 (E.D. Pa. 2008)........................................................................... 16

*Piambino v. Bailey*,
  757 F.2d 1112 (11th Cir. 1985) ............................................................................ 7

*Ratner v. Bennett*,
　No. 92-cv-4701, 1996 WL 243645  (E.D. Pa. May 8, 1996)................................................. 9, 12

*Strube v. Am. Equity Inv. Life Ins. Co.*,
　226 F.R.D. 688 (M.D. Fla. 2005)...................................................................................... 9, 12

*United States v. Glens Falls Newspapers, Inc.*,
　160 F.3d 853 (2d Cir. 1998)................................................................................................. 10

*W.R. Huff Asset Mgmt Co., LLC v. Deloitte & Touche LLP*,
　549 F.3d 100 (2d Cir. 2008).................................................................................................... 5

*Warren v. City of Tampa*,
　693 F. Supp. 1051 (M.D. Fla. 1988)................................................................................. 9, 14

*Woodward v. NOR-AM Chem. Co.*,
　No. 94-cv-0780, 1996 WL 1063670 (S.D. Ala. May 23, 1996) .......................................... 9, 11

## Statutes

Fed. R. Civ. P. 23(e) ............................................................................................................... 7

Securities Exchange Act of 1934 ............................................................................................ 2

## Other Authorities

David F. Herr, Annotated Manual for Complex Litigation,
　§21.6 (4th ed. 2010)................................................................................................................ 9

William B. Rubenstein, Alba Conte and Herbert B. Newberg,
　4 Newberg on Class Actions §11:41, §11:45 (4th ed. 2011) .............................................. 8, 11

## I.      INTRODUCTION

Lead Plaintiff[1] respectfully submits that the proposed $1.95 million settlement satisfies all relevant legal standards for final approval under Rule 23 of the Federal Rules of Civil Procedure.   The settlement recovers over 13.7% of the $14.2 million maximum conceivable damages that plaintiff's damages expert believes could have been recovered had plaintiffs prevailed at trial.   As a percentage of estimated damages, the settlement is multiples higher than the norm (which for 2010 securities class action settlements has been reported as only approximately 2.8%).   It therefore represents an excellent result.   Additionally, while class members have until September 7, 2011, to file objections or to request exclusion from the class, to date, not a single such filing or request has been received.   This favorable reaction weighs heavily in favor of the settlement's being approved.

The settlement is eminently fair and reasonable not only considering the significant amount of the recovery but also the risks of further litigation.   Moreover, there is nothing to suggest collusion or fraud between the parties.   The settlement resulted from arms'-length negotiations between the parties, involved a retired Florida State Court Judge as the mediator, and was undertaken in good faith by both sides.   It reflects a reasoned compromise based on Lead Counsel's knowledge of the strengths and weaknesses of the case gained through investigation, motion practice, and discovery over the course of three years.

For the reasons set forth in this memorandum, it is respectfully submitted that the Court should enter an order granting Lead Plaintiff's motion for: (a) final approval of the proposed settlement; and (b) final approval of the proposed Plan of Allocation of the settlement proceeds.[2]

---

[1] Unless otherwise indicated, all capitalized terms herein have the same meaning as is ascribed in the Stipulation of Settlement (the "Stipulation") filed with the Court on June 14, 2011.

[2] The Plan of Allocation was set forth in the Notice, which has been mailed to potential Class Members pursuant to the Court's Preliminary Approval Order.   *See Declaration of Mark A. Strauss in Support of Proposed Class Settlement, Plan of Allocation, and Award of Attorneys' Fees and Expenses*, dated August 24, 2011 ("Strauss Decl.") ¶¶10-12 and Exs. A, B-1 annexed thereto and submitted simultaneously herewith.

II.     **SUMMARY OF ALLEGATIONS AND CLAIMS**

This is a securities class action lawsuit on behalf of all persons or entities who purchased or acquired the securities of Levitt during the Class Period. Claims are alleged against Levitt and its Chairman and Chief Executive Officer, Alan B. Levan, for violations of the Securities Exchange Act of 1934 (the "Exchange Act"). Strauss Decl. ¶ 14.

The gravamen of the complaint is that Levitt, a homebuilder, materially overstated its financial results by failing to timely record impairments in the value of its homebuilding inventory in the first quarter of 2007. Strauss Decl. ¶ 15.

The complaint alleges that, given the rapidly deteriorating condition of the real estate market – particularly in the southeastern United States where Levitt operated – substantial impairments amounting to tens of millions of dollars were warranted under Generally Accepted Accounting Principles ("GAAP"), specifically, Statement of Financial Accounting Standard No. 144 ("SFAS No. 144"). Strauss Decl. ¶ 16.

GAAP, as set forth in Financial Accounting Standards Board ("FASB") Statement of Concepts ("Concepts") No. 5, ¶87 requires that an entity record a loss when it becomes apparent that an asset has been impaired. Strauss Decl. ¶ 17. According to GAAP, as set forth in SFAS No. 144, *Accounting for the Impairment or Disposal of Long-Lived Assets*, ¶ 7, "impairment is the condition that exists when the carrying amount of a long-lived asset (asset group) exceeds its fair value." *Id.* Under SFAS No. 144, ¶8 an entity shall test for recoverability of long-lived assets *whenever* events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable.[3] *Id.*

---

[3] Specifically, SFAS No. 144 provides guidance on how companies must recognize impairments of the value of long-lived assets that they report in their financial statements. Companies initially report the fair market value of their assets on their balance sheets. However, a change in circumstances, such as those listed above, may affect the value of the reported asset. When changed circumstances affect the value of an asset, SFAS No. 144 requires a company to test whether it needs to account for an impairment. The test requires a company to determine whether the current value reported on the balance sheet exceeds the total amount of undiscounted future cash flows expected to result from the use and eventual disposition of the asset. If the

*(continued…)*

Companies must then use the SFAS No. 144 framework to recognize a decline in long-term asset value on their balance sheets. Strauss Decl. ¶ 18. The complaint alleges that, instead of properly recognizing the massive impairment charges warranted by SFAS No. 144, Defendants falsely announced a grossly understated impairment in the first quarter of 2007 amounting to only $282,000. *Id*. Meanwhile, Defendants issued a series of materially misleading statements publicly assuring investors that Levitt "constantly" reviewed for impairments and was taking appropriate charges as warranted. *Id*.

Plaintiffs based the complaint in large part on an investigation by Lead Counsel indicating that Levitt's reported impairment charge of $282,000 in the first quarter of 2007 should have been substantially larger. Strauss Decl. ¶ 19. According to the complaint, Defendants recklessly disregarded that Levitt's internal processes for computing impairments was not functioning properly. *Id*. Specifically, valid impairment analyses required accurate and up-to-date cash flow projections for each of Levitt's numerous development projects. *Id*. Those projections were based on "proforma" spreadsheets, which were supposed to contain current data regarding, *inter alia*, sales, starts, titles, and pricing. *Id*. However, according to a former Levitt executive, Jeff Hoyos (cited in the complaint as a confidential witness), Levitt failed to update the information in its "proforma" spreadsheets from at least December 2006 through the end of the Class Period. *Id*. Accordingly, Levitt erroneously used outdated data for its cash flow projections and impairment calculations during the Class Period. Finally, in or about July 2007, Levitt re-hired Hoyos in the capacity of independent consultant. *Id*. Defendants tasked Hoyos specifically with updating Levitt's cash flow proformas in order to prepare accurate and up-to-date impairment analyses. *Id*.

On August 9, 2007, based on Hoyos' work, Levitt "caught up" on its impairment reporting and announced $63 million in write-downs with respect to the second quarter of 2007. Strauss Decl. ¶ 20. Then, on October 11, 2007, Levitt announced additional impairments in

---

book value exceeds the undiscounted future value, then an impairment must be recognized.

connection with its third quarter 2007 financial results. *Id.*  It also announced that outstanding loans to its operating subsidiary, Levitt & Sons, were not recoverable. *Id.*

As a result of these disclosures, the market price of Levitt's stock dropped substantially, causing damages to shareholders who purchased during the Class Period.  Strauss Decl. ¶ 21.

Defendants have denied all of Plaintiffs' allegations and do not admit, as part of this settlement, any such wrongdoing. Strauss Decl. ¶ 22.

## III.    PROCEDURAL HISTORY

The Litigation was filed on January 25, 2008, in the United States District Court for the Southern District of Florida against defendants Levitt, Levan, and Scanlon. Strauss Decl. ¶ 23. The Class alleged in the complaint was comprised of all persons who purchased Levitt common stock from January 31, 2007 through August 14, 2007. *Id.*

By order dated July 8, 2008, following the publication of notice in accord with the provisions of the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), the Court appointed Robotti as Lead Plaintiff and approved its selection of Kirby McInerney LLP as Lead Counsel and Berman DeValerio as Liaison Counsel.  Strauss Decl. ¶ 24. On September 23, 2008, Robotti filed an Amended Complaint alleging that Levitt, Levan and Scanlon made material misstatements and omissions regarding Levitt's financial condition during the Class Period. *Id.*

On August 10, 2009, the Court granted in part and denied in part defendants' motion to dismiss. Strauss Decl. ¶ 25.  The Court sustained the allegations relating to the alleged failure to report impairments. *Id.* However, it dismissed the allegations against Scanlon and relating to Levitt's financial covenants for failure to satisfy the PSLRA's pleading standards. *Id.*  Finally, the Court granted leave to amend the complaint to cure the deficiencies. *Id.*

On September 18, 2009, Robotti filed the Second Amended Complaint, which discontinued the claims against Scanlon. Strauss Decl. ¶ 26.   On April 9, 2010, Robotti filed a motion for class certification. Strauss Decl. ¶ 27.  On July 21, 2010, the Court denied Robotti's motion for class certification on the ground that, in light of the then-recent decision in *W.R. Huff*

4

*Asset Mgmt Co., LLC v. Deloitte & Touche LLP*, 549 F.3d 100 (2d Cir. 2008), Robotti lacked standing. *Id*. The Court also vacated its order appointing Robotti as Lead Plaintiff and granted leave for Lead Counsel to cure the standing deficiency through the substitution or joinder of a new plaintiff. *Id*.

On July 30, 2010, Robotti filed a Third Amended Complaint joining Sullivan & Serwitz as an additional plaintiff. Strauss Decl. ¶ 28.    On December 1, 2010, the Court appointed Sullivan & Serwitz as substitute Lead Plaintiff. Strauss Decl. ¶ 29.  The Court also certified a Class under Federal Rule of Civil Procedure 23(c)(1) consisting of all persons and entities that purchased or acquired Levitt securities during the Class Period and who suffered damages thereby. *Id*.[4]

Thereafter, Lead Counsel conducted extensive discovery on behalf of the Class.  Lead Counsel served three separate requests for production of documents on Defendants. Strauss Decl. ¶ 30.   Lead Counsel and counsel for Defendants also met and conferred on numerous occasions to determine the appropriate scope of discovery, the means of electronic production, the identity of document custodians and appropriate search terms to be used in Defendants' document search and production. *Id*. In response to plaintiffs' document request, Defendants produced approximately 100,000 documents to Lead Counsel. *Id*.

Lead Counsel also issued twelve subpoenas to third party witnesses and received substantial document productions from seven of them. Strauss Decl. ¶ 31.    Lead Counsel thoroughly reviewed all of the documents produced, which included complex financial and accounting documents. *Id*. In light of the complex nature of these documents, Lead Counsel engaged forensic accountants to assist in their review and analysis. *Id*. Lead Counsel also

---

[4] Excluded from the Class are: (i) the Defendants; (ii) any person who was a director, officer or employee of Levitt; (iii) the members of the family of each of the Individual Defendants; (iv) any entity in which any Defendants have a controlling interest; and (v) the legal affiliates, representatives, heirs, controlling persons, successors and predecessors-in interest, or assigns of any such excluded party. *Id.*

deposed two important fact witnesses and prepared for eight other fact witness depositions. *Id*. Additionally, plaintiffs' experts undertook extensive analyses of the facts and documents and began preparing detailed drafts of reports to be disclosed in discovery. *Id*.

On behalf of plaintiffs, Lead Counsel also responded to discovery requests issued by Defendants. Strauss Decl. ¶ 32.  Lead Counsel met and conferred with counsel for Defendants as to the appropriate scope of discovery against plaintiffs, responded to three sets of document requests and interrogatories served on plaintiffs, and defended representatives of Robotti and Sullivan & Serwitz at their depositions. *Id*.  Further, Defendants deposed three fact witnesses. Lead Counsel defended two such witnesses at their depositions, and participated in the deposition of the third witness. *Id*.

Lead Counsel and counsel for Defendants agreed to mediate before Judge Gerald T. Wetherington. Strauss Decl. ¶ 34.   The mediation occurred on April 13, 2011, in Miami, Florida. *Id*. Top executives of Levitt attended the mediation, as did representatives of Levitt's insurance carrier and attorneys for Levitt's insurance carrier.  *Id*.

Prior to the mediation, the Settling Parties provided Judge Wetherington with lengthy submissions detailing what the Settling Parties believed were the relevant facts and applicable legal principles. Strauss Decl. ¶ 35. Counsel also made detailed oral presentations at the mediation, addressing such issues as whether Defendants made misstatements and omissions, the materiality of any misstatements and omissions, causation, the amount of recoverable damages, and the methodology employed in calculating those damages. *Id*.

Following extensive arms'-length negotiations, facilitated by Judge Wetherington, the Settling Parties reached an agreement in principle on the terms and conditions of the proposed settlement. Strauss Decl. ¶ 36. The settlement will, if approved by the Court, resolve all of the differences between the parties and settle the Litigation. *Id*. The Settling Parties memorialized those terms and conditions in the MOU. *Id*.

Thereafter, the parties continued to negotiate the terms of Stipulation, which was filed with the Court on June 14, 2011. Strauss Decl. ¶ 37.  Lead Counsel continued to vigorously press

6

the Class's interest through negotiation of beneficial settlement terms, such as that the cost of claims administration be paid out of the Settlement Fund. *Id.*

After the formal agreement was finalized on or about June 14, 2011, the Stipulation was executed by the parties and submitted to the Court on June 14, 2011. Strauss Decl. ¶ 38. Preliminary approval was granted by order entered June 27, 2011. *Id.* In preparation of its preliminary approval papers, Lead Counsel engaged the Court-appointed claims administrator Garden City Group, Inc. ("GCG"), and supervised GCG in all administration proceedings to date, including effectuation of Notice to the Class, publication of the Summary Notice, establishment of the Notice website, and ongoing collection and processing of Class Members' claim forms. *Id.* Lead Counsel also consulted with a damages expert in constructing the Plan of Allocation. *Id.*

## IV.    ARGUMENT

### A.    This Settlement Should Be Approved As It is Fair, Reasonable and Adequate Under The Eleventh Circuit's Standards

Federal Rule of Civil Procedure 23(e) requires court approval for any proposed class settlement in a class-action context.  Fed. R. Civ. P. 23(e).[5] Moreover, the Court is vested with broad discretion when approving a settlement.  *See Behrens*, 118 F.R.D. at 537.  In determining whether to approve the settlement, the court "should always review the proposed settlement in light of the strong judicial policy that favors settlements."  *Id.* at 538; *see also In re U.S. Oil & Gas Litig.*, 967 F.2d 489, 493 (11th Cir. 1992) (noting that "[p]ublic policy strongly favors the pretrial settlement of class action lawsuits.").  Settlements of complex cases particularly warrant this judicial approach:

> This policy has special importance in class actions with their notable uncertainty, difficulties of proof, and length. Settlements of complex cases contribute greatly to the efficient utilization of scarce judicial resources

---

[5]*Dikeman v. Progressive Exp. Ins. Co.*, 312 F. App'x 168, 171 (11th Cir. 2008); *In re Sunbeam Sec. Litig.*, 176 F. Supp. 2d 1323, 1329 (S.D. Fla. 2001) (citing *Piambino v. Bailey*, 757 F.2d 1112, 1139-42 (11th Cir. 1985); *Behrens v. Wometco Enterprises, Inc*., 118 F.R.D. 534, 537 (S.D. Fla. 1988), *aff'd*, 899 F.2d 21 (11th Cir. 1990).

> and achieve the speedy resolution of justice, for a just result is often no
> more than an arbitrary point between competing notions of reasonableness.

*Behrens*, 118 F.R.D. at 538 (internal citations and quotations omitted).  *See also In re Sunbeam*, 176 F. Supp. 2d at 1329.  In determining whether to approve the settlement, the Court must decide whether it is "fair, adequate, reasonable, and not the product of collusion." *Leverso v. SouthTrust Bank of AL., Nat. Assoc.*, 18 F.3d 1527, 1530 (11th Cir. 1994); *see also Bennett v. Behring Corp.*, 737 F.2d 982, 986 (11th Cir. 1984). The Eleventh Circuit has recognized six factors when considering whether to approve a settlement:

> (1) the existence of fraud or collusion behind the settlement;
> (2) the complexity, expense, and likely duration of the litigation;
> (3) the stage of the proceedings and the amount of discovery completed;
> (4) the probability of the plaintiffs' success on the merits;
> (5) the range of possible recovery; and
> (6) the opinions of the counsel, class representatives, and the substance and amount of opposition to the settlement.

*Canupp v. Liberty Behavioral Health Corp.*, 417 F. App'x 843, 845 (11th Cir. 2011); *Holman v. Student Loan Xpress, Inc.*, No. 08 Civ. 305, 2009 WL 4015573, at *4 (M.D. Fla. Nov. 19, 2009); *Leverso*, 18 F.3d at 1530-31 n.6. Here, consideration of each of the enumerated fairness factors establishes that the settlement is fair, reasonable and adequate.

The proposed settlement satisfies the standard for final approval because it is within the range of possible approval and there are no grounds to doubt its fairness or adequacy. The proposed settlement included arms'-length negotiations by competent counsel and an immediate benefit to Class Members, instead of the possibility of no recovery after continued litigation. Significant hurdles (including summary judgment) await the Class if there is no settlement. Accordingly, Lead Plaintiff and Lead Counsel believe that the settlement is fair and in the best interest of the settlement Class.

### 1.    The Settlement Is the Product of Arms'-Length Negotiations

A proposed settlement is presumptively fair and reasonable when it is the result of arms'-length negotiations. *See* William B. Rubenstein, Alba Conte and Herbert B. Newberg, 4 Newberg on Class Actions §11:41, at 10 (4th ed. 2011); *see also* David F. Herr, Annotated

Manual for Complex Litigation, §21.6, at 14 (4th ed. 2010) ("a presumption of fairness, adequacy and reasonableness may attach to a class settlement reached in arm's-length negotiations between experienced, capable counsel"). The sharply contested nature of the proceedings in this case demonstrates the lack of fraud or collusion behind the settlement.[6]

As indicated above, this settlement was reached after more than three years of litigation that included extensive discovery and a mediation session presided over by a retired judge. The settlement negotiations were conducted with the same vigor as the highly contested motion practice and the meticulous discovery preparations. Each of the Settling Parties was at all times represented by experienced counsel. *See* Strauss Decl. at Exs. C3 and D3. The participation of experienced counsel throughout the process, and of a retired judge in mediating the settlement, sufficiently demonstrates the absence of collusion.

### 2. The Complexity, Expense, and Duration of Litigation Renders This Settlement Fair, Reasonable And Adequate

"[C]omplexity, expense and duration of the litigation" as a whole weigh heavily in favor of approving a settlement. *Bennett*, 737 F.2d at 986; *Ratner v. Bennett*, No. 92 Civ. 4701, 1996 WL 243645, at *5 (E.D. Pa. May 08, 1996). *See Woodward v. Nor-AM Chem. Co.*, No. 94 Civ. 0780, 1996 WL 1063670, at *21 (S.D. Ala. May 23, 1996) (settlements "alleviate the need for judicial exploration of [...] complex subjects, reduce litigation cost, and eliminate the significant risk that individual claimants might recover nothing."). "Particularly in class action suits, there is an overriding public interest in favor of settlement [because it] is common knowledge that class action suits have a well-deserved reputation as being most complex." *Strube v. Am. Equity Inv.*

---

[6] *See, e.g., In re Sunbeam*, 176 F. Supp. 2d at 1329 n.3 (noting "no evidence" or "allegations" of fraud or collusion); *Ingram v. The Coca-Cola Co.*, 200 F.R.D. 685, 693 (N.D. Ga. 2001) ("There is no doubt that this case has been adversarial, featuring a high level of contention between the parties throughout the litigation, the mediation and the arbitration and drafting of the Settlement Agreement."); *Warren v. City of Tampa*, 693 F. Supp. 1051, 1055 (M.D. Fla. 1988) (finding no evidence of collusion because "the parties conducted discovery and negotiated the terms of settlement for an extended period of time"), *aff'd*, 893 F.2d 347 (11th Cir. 1989).

*Life Ins. Co.*, 226 F.R.D. 688, 698 (M.D. Fla. 2005) (quoting *Cotton v. Hinton*, 559 F.2d 1326, 1331 (5th Cir. 1977)).   Securities claims are notoriously difficult to prove and vigorously defended.

These principles apply here. This case involves thousands of investors with alleged losses of millions of dollars. The claims and defenses are complex and litigating them has been difficult and time consuming. If this litigation were to continue, significant additional time and resources would be necessary for the completion of fact and expert discovery, the briefing of motions for summary judgment, pre-trial proceedings, trial itself, and possible appeals.   Thus, although this case has already been pending for more than three years, recovery by any means other than settlement would require additional years of litigation. *See United States v. Glens Falls Newspapers, Inc.*, 160 F.3d 853, 856 (2d Cir. 1998) (noting that "a principal function of a trial judge is to foster an atmosphere of open discussion among the parties' attorneys and representatives so that litigation may be settled promptly and fairly so as to avoid the uncertainty, expense and delay inherent in a trial.").

Additionally, plaintiffs' claims involve numerous complex legal and financial issues. Strauss Decl. ¶¶ 41 - 47. The evidence would entail numerous witnesses and potentially dozens of documents and emails. *See* Strauss Decl. ¶¶ 30 - 32. The accounting, damages and loss-causation issues would require extensive expert discovery and testimony, adding considerably to the complexity, expense, and duration of the action and calling on the jury to determine a "battle" of experts. Strauss Decl. ¶ 41.  Litigating this action to verdict would also require many hours of the Court's time. Consequently, the settlement here enables the Class to immediately recover a meaningful sum of money in circumstances where it would otherwise not recover for years, if at all. *Id.*

### 3.    The Stage Of Proceedings At Which The Settlement Was Achieved

There is no precise formula for what constitutes sufficient evidence to enable the court to analyze intelligently the contested questions of fact. It is clear that the court need not possess evidence to decide the merits of the

10

> issue, because the compromise is proposed in order to avoid further litigation. Nevertheless, the court must possess sufficient information to determine whether the settlement terms are fair, adequate and reasonable.

Rubenstein, Conte & Newberg, *supra*, §11:45. *See also Woodward*, 1996 WL 1063670, at *17.

Courts favor a proposed settlement "achieved early in the litigation, but not so early that [Lead] Counsel did not have sufficient information to negotiate with." *Lipuma v. Am. Express*, 406 F. Supp. 2d 1298, 1324-25 (S.D. Fla. 2005).

Here, plaintiffs' knowledge of the issues and the evidence is unquestionably adequate to support the settlement.  As indicated above, plaintiffs have a clear understanding of the strengths and weaknesses of their claims based on: (i) an extensive investigation, including interviews with former Levitt employees; (ii) research of the law with regard to the claims asserted in the action and the possible defenses thereto; (iii) consultations with damages and accounting experts accountants; (iv) extensive review and analysis of approximately 100,000 documents; (v) preparation for and the taking and/or defending of depositions of five important fact witnesses; (vi) briefing of Defendants' motion to dismiss; and (vii) hard-fought arms'-length negotiations with Defendants, including mediation before an experienced mediator. The next step in the case would have been the completion of fact depositions, formal expert discovery, and summary judgment motions. *See* Strauss Decl. ¶¶ 24, 25, 30 – 32, 34 - 37.

Accordingly, the stage and development of the proceedings were sufficiently well advanced.  Lead Counsel was fully familiar with the issues and evidence and needed to seriously consider settlement or else risk no recovery for the Class.  In light of how far along this case had progressed, it is appropriate for the Court to now grant final approval of the settlement.

### 4.     The Probability Of Lead Plaintiffs' Success On The Merits Renders This Settlement Fair, Reasonable and Adequate

The ability to avoid the risk, uncertainty, expense, complexity, and likely duration of further litigation should be considered by the Court in reviewing this motion.  It is well settled that "[t]he risks of litigation are what ultimately leads to settlement." *Chatelain v. Prudential-Bache Sec., Inc.*, 805 F. Supp. 209, 215 (S.D.N.Y. 1992).  In assessing this request for final

approval, "[t]he Court should consider the vagaries of litigation and compare the significance of immediate recovery by way of the compromise to the mere possibility of relief in the future, after protracted and expensive litigation. In this respect, '[i]t has been held proper to take the bird in the hand instead of a prospective flock in the bush.'" *Lipuma*, 406 F. Supp. 2d at 1323.  Courts attempting to balance these factors have recognized that "'stockholder litigation is notably difficult and notoriously uncertain' even in the best of circumstances." *Ratner* 1996 WL 243645, at *6; *In re SmithKline Beckman Corp. Sec. Litig.*, 751 F. Supp. 525, 529 (E.D. Pa. 1990) (same).

Here, plaintiffs duly considered the risks inherent in litigating securities class actions generally and this particular litigation.  While plaintiffs are prepared to go to trial against the Defendants and remain confident in their ability to ultimately prove their claims, plaintiffs face particular risks in this case with respect to proving the elements of *scienter*, falsity and loss causation, and the full amount of damages sustained by the Class. *See* Strauss Decl. ¶¶ 44 - 47.

Defendants have denied and continue to deny each and all of the claims and contentions alleged by plaintiffs in the case. Strauss Decl. ¶ 44. While plaintiffs believe that they could have proven otherwise, evidence revealed in discovery suggests that Defendants' explanation of the relevant events was one that might be believed by the jury. *Id*.  Specifically, Defendants were expected to argue that, contrary to the Class's allegations, Levitt reported all required impairments in a timely manner and that the losses that led to the adverse disclosures complained of resulted from a sudden, dramatic decline in the Florida real estate market about which Levitt had forewarned investors. *Id*.

Under these circumstances, the proposed settlement balances the risks, costs, and delay inherent in complex cases.

### 5.    The Range Of Possible Recovery Renders This Settlement Fair, Reasonable and Adequate

"Particularly in class action suits, there is an overriding public interest in favor of settlement [because it] is common knowledge that class action suits have a well-deserved reputation as being most complex."  *Strube*, 226 F.R.D. at 698 (quoting *Cotton*, 559 F.2d at

1331).  Particularly complex is the calculation of damages, an issue that generally requires expert testimony.

Here, plaintiffs' expert has calculated damages attributable to the alleged decline in the Levitt's stock to be a maximum of $14.2 million. Strauss Decl. ¶ 46.  Defendants have denied and continue to deny that the Class suffered any damages at all. *Id.*

Plaintiffs acknowledge that, at trial, recoverable damages could be significantly less than plaintiff's expert's $14.2 million estimate. Strauss Decl. ¶ 47.   There is a significant risk that the Court determines that a substantial part of the alleged stock decline was attributable to factors other than the alleged false or misleading statements. *Id.*  Additionally, there is a substantial risk that the Court finds that the market for Levitt's stock was so efficient that it digested Levitt's corrective disclosures promptly, in one day, potentially eliminating the multiple-day stock price declines that make up a large portion of the Class's asserted damages. *Id.*  Possible recovery, therefore, is indeterminate. *Id.*   This militates in favor of a settlement because it secures immediate compensation for the Class. *Id.*

Moreover, the $1.95 million recovery is within the range of reasonableness. Strauss Decl. ¶ 48.  A study of settlements in securities class actions shows that "across all post–Reform Act settlements, more than half of the cases have settled for less than $10 million." *Id.* (citing Cornerstone Research, "Securities Class Action Settlements: 2010 Review and Analysis" (2011) (Ex. F to Strauss Decl., at p.3)).  Moreover, the median settlement amount for securities class actions settled in 2010 was $11.3 million (Ex. F. at p.2), and in 2009, it was $8 million (Ex. at p.2). *Id.*

Most importantly, the statistic that best demonstrates the reasonableness of this settlement is that, for all cases settled in 2010, the median settlement recovered a mere 2.8% of plaintiffs' estimated damages. Strauss Decl. ¶ 49 citing Ex. F at p.5. This settlement, recovering approximately 13.7% of the $14.2 million that plaintiffs' damages expert believes would be the maximum recovery had the Class prevailed at trial on all of its claims, is thus multiples higher than the norm. *Id.* It represents a highly reasonable compromise. *Id.*  Moreover, given that some

of plaintiffs' claims have already been dismissed and that plaintiffs still face significant hurdles in the prosecution of this action, this settlement clearly meets the requisite standards of fairness, reasonableness and adequacy.[7]

### 6. The Opinions Of Counsel, Class Representatives, and the Substance Of Opposition To The Settlement Support This Settlement as Fair, Reasonable And Adequate

Given the fairly subjective nature of the guiding considerations, it is proper for the court to accord significant weight to the judgment of experienced counsel for the settling parties.[8]

After adversarial litigation and negotiations and supervised mediation, experienced counsel for the respective parties have concluded that the proposed settlement is in the best interests of their respective clients.  Both parties have had ample opportunity to fully inform themselves regarding the merits of the claims and defenses.  The settlement does not unfairly favor one group of Class Members over others, nor does it provide richer results for the Lead Plaintiff.  Further, the settlement falls within the "range of possible approval."

Furthermore, a highly detailed notice plan was carried out to ensure that as many potential Class Members as possible received the Notice of the Settlement and that the

---

[7] *See, e.g.*, *In re Cendant Corp. Litig.*, 264 F.3d 201, 241 (3d Cir. 2001) (typical recoveries in securities cases range from 1.6% to 14%); *Cagan v. Anchor Sav. Bank FSB*, No. 88 Civ. 3024, 1990 WL 73423, at *12-13 (E.D.N.Y. May 22, 1990) (approving $2.3 million class settlement over objections that "best possible recovery would be approximately $121 million"); *Behrens* 118 F.R.D. at 542 ("The mere fact that the proposed settlement of $.20 a share is a small fraction of the desired recovery of $3.50 a share is not indicative of an inadequate compromise.").

[8] *See Fresco v. Auto Data Direct, Inc*, No. 03 Civ. 61063, 2007 WL 2330895, at *6 (S.D. Fla. May 14, 2007) ("The unanimous support of counsel for this settlement weighs strongly in favor of its approval."); *Warren*, 693 F. Supp. at 1060; *Mashburn v. Nat. HealthCare, Inc.*, 684 F. Supp. 660, 672 (M.D. Ala. 1988) ("If plaintiffs' counsel did not believe these factors all pointed substantially in favor of this settlement as presently structured, this Court is certain that they would not have signed their names to the settlement agreement."); *In re Domestic Air Transp. Antitrust Litig.*, 148 F.R.D. 297, 312-13 (N.D. Ga. 1993) ("In determining whether to approve a proposed settlement, the Court is entitled to rely upon the judgment of the parties' experienced counsel. '[T]he trial judge, absent fraud, collusion, or the like, should be hesitant to substitute its own judgment for that of counsel.'" (citations omitted)).

information they had regarding the proposed settlement was as complete and thorough as possible. *See* Strauss Decl. ¶¶ 10-13 (citing Ex. B, Fraga Aff.).  Pursuant to the Preliminary Approval Order, Class Members were notified that they have until September 7, 2011, to request exclusion from the Settlement class or to object to the settlement. Ex. A.  The Claims Packets included detailed information about how Class Members could exclude themselves from the settlement or voice objection to any part of the proposed compromise. *Id*. Currently, after approximately six weeks after notice was furnished to the Class, and just two weeks prior to the deadline to object or opt-out, no objections have been received from Class Members, and no exclusion requests have been received by the Claims Administrator to date.  *See* Strauss Decl. ¶51 (citing Ex. B, Fraga Aff. ¶¶ 11-12).

As many courts have noted, even "a small number of objectors from a plaintiff class of many thousands is strong evidence of a settlement's fairness and reasonableness." *Ass'n. for Disabled Americans, Inc. v. Amoco Oil Co.*, 211 F.R.D. 457, 467 (S.D. Fla. 2002).[9] Here, however, there have been none, reflecting a positive reaction from the Class. For all the above reasons, the proposed settlement is fair, reasonable and adequate.  Accordingly, the settlement should receive final approval.

### B.    The Plan Of Allocation Should Be Approved As It Is Fair, Reasonable, And Adequate

"Approval of a plan of allocation of a settlement fund in a class action is governed by the same standards of review applicable to approval of the settlement as a whole: the distribution plan must be fair, reasonable and adequate."[10]  The Court will approve a plan of allocation when

---

[9]*See also Ingram*, 200 F.R.D. at 692 n.7 ("[A] relatively small number of objectors can be taken as 'some indication that the class members as a group did not think the settlement was unfair.'" (citation omitted)); *Austin v. Pa. Dept. of Corrections*, 876 F. Supp. 1437, 1458 (E.D. Pa. 1995) ("Because class members are presumed to know what is in their best interest, the reaction of the class to the Settlement Agreement is an important factor for the court to consider.").

[10]*In re Merck & Co., Inc. Vytorin ERISA Litig.*, No. 08 Civ. 285, 2010 WL 547613, at *6 (D.N.J. Feb. 9, 2010) (citing *In re Ikon Office Solutions, Inc., Sec. Litig.*, 194 F.R.D. 166, 184 (E.D. Pa. (*continued...*)

"the formula for the calculation of the payments to class members from the settlement fund provides a fair and reasonable basis upon which to allocate the fund." *Carpenters Health & Welfare Fund v. Coca-Cola Co.*, 587 F. Supp. 2d 1266, 1275 (N.D. Ga. 2008).  Further, when "formulated by competent and experienced class counsel," a plan for allocation of net settlement proceeds "need have only a reasonable, rational basis."  *In re Global Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436, 462 (S.D.N.Y. 2004).  "Generally, a plan that reimburses class members based on the nature and extent of their injuries is considered reasonable."  *Mehling v. New York Life Ins. Co.*, 248 F.R.D. 455, 463 (E.D. Pa. 2008). Moreover, a plan of allocation is fair, reasonable and adequate when the plan is based upon an analysis of the level of price inflation of company's stock and an evaluation of company's various disclosures concerning its financial status and when the plan will equitably distribute the settlement fund. *See In re Sunbeam,* 176 F. Supp. 2d at 1328.

Lead Counsel developed the Plan of Allocation in close consultation with plaintiffs' damages expert and believes that it provides a fair and reasonable method to equitably distribute the Settlement Fund among Class Members.  Strauss Decl. ¶ 55.  The Plan of Allocation is based on plaintiffs' damages expert's assessment of damages that may have been recovered from the alleged stock drops had liability been successfully established, with respect to the amount of inflation that was removed by the alleged corrective disclosures. *Id.*  The proposed plan determines payments to claimants based on calculation of each claimant's Recognized Loss Amount, which depends on several factors including when the claimant purchased and sold Levitt common stock, whether the Levitt common stock was held at the time of the alleged corrective disclosures, and the statistical significance of each stock drop. *Id.*  Based on guidance from plaintiffs' damages expert, this plan attempts to allocate payment on a *pro rata* basis based on the relative size of each claimant's loss due to Defendants' alleged misstatements. *Id.*

---

2000)); *In re Oracle Sec. Litig.*, No. 90 Civ. 0931, 1994 WL 502054, at *1 (N.D. Cal. June 18, 1994) (citing *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1284-85 (9th Cir. 1992)).

Although some Class Members will benefit differently under the Plan of Allocation, "there is no rule that settlements benefit all class members equally[….]" *Holmes v. Cont'l Can Co.*, 706 F.2d 1144, 1148 (11th Cir. 1983) (citation omitted).

Although the deadline for objecting to the proposed settlement is still two weeks away from the date of this filing, it is worth noting that thus far there have been no objections to the proposed Plan of Allocation described in the Notice. Strauss Decl. ¶ 51.

Class Counsel believes that the Plan of Allocation is a fair and reasonable way to apportion the settlement and should be approved.

### C.   Notice To The Class Satisfies Due Process Requirements

In accordance with the Preliminary Approval Order, GCG caused the Court-approved Notice and Proof of Claim forms to be mailed by first class mail, postage prepaid to 5319 potential Class Members. Strauss Decl. ¶ 12 (citing Ex. B, Fraga Aff. at ¶ 7).  On July 15, 2011, the Court-approved Summary Notice was published in *Investor's Business Daily* and disseminated over *Business Wire*.  Strauss Decl. ¶ 12 (citing Ex. B, Fraga Aff. at ¶ 8).   The Notice program meets the requirements of Rule 23 of the Federal Rules of Civil Procedure, which calls for the "best notice practicable under the circumstances including individual notice to all members who can be identified through reasonable effort."  *See Eisen v. Carlisle & Jacquelin*, 417 U.S. 156 (1974) (emphasis omitted).  As is required in class actions require, the Class has been given notice of the proposed settlement and plan of allocation, as well as the rights of Class Members and the method and dates by which they can object to, or opt-out of, the settlement. *See* Strauss Decl. ¶ 10; Ex. A. Further, the Class had been advised of the date of the final fairness hearing at which time they will have an opportunity to be heard with respect to any objection raised. *See* Strauss Decl. ¶ 10, 52.

## V.    CONCLUSION

For all of the foregoing reasons, Lead Plaintiff respectfully requests that the Court approve the proposed settlement as fair, reasonable and adequate; approve the Plan of Allocation as fair, reasonable and adequate; and enter the accompanying proposed Final Judgment and Order of Dismissal With Prejudice.

Dated:  August 24, 2011                           Respectfully Submitted,

                                                  BERMAN DeVALERIO

                                                  By:      /s/ Kyle G. DeValerio
                                                          Kyle G. DeValerio (FBN 0018565)
                                                          kdevalerio@bermandevalerio.com
                                                          3507 Kyoto Gardens Drive, Suite200
                                                          Palm Beach Gardens, FL  33410
                                                          Tel:    (561) 835-9400
                                                          Fax:    (561) 835-0322

                                                  *Liaison Counsel and Attorney for Lead Plaintiff and the Class*

                                                  KIRBY McINERNEY LLP

                                                          Daniel Hume, pro hac vice
                                                          dhume@kmllp.com
                                                          Ira M. Press, pro hac vice
                                                          Ipress@kmllp.com
                                                          Mark A. Strauss, pro hac vice
                                                          mstrauss@kmllp.com
                                                          825 Third Avenue, 16th Floor
                                                          New York, NY  10022
                                                          Tel:    (212) 371-6600
                                                          Fax:    (212) 751-2540

                                                  *Lead Counsel and Attorney for Lead Plaintiff and the Class*

18

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on August 24, 2011, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system.  The electronic case filing system sent a "Notice of Electronic Filing" to the attorneys of record who have consented in writing to accept this notice as service of this document by electronic means.

                                       s/Kyle G. DeValerio
                                       KYLE G. DeVALERIO